IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : CRIMINAL NO. 21-CR-10-JMY-1 |
| | : |
| NICHOLAS MARRERO | : |
| a/k/a "Marcus Rivera" | : |

**MEMORANDUM**

**YOUNGE, J.**                                                                                    **DECEMBER 13, 2021**

Presently before the Court is Defendant Nicholas Marrero's Motion to Suppress ("Mot.," ECF No. 20).  The Motion, filed August 27, 2021, seeks to suppress the black and silver SCCY Industries CPX-2 firearm and ammunition Defendant is charged with possessing on September 6, 2019.[1]  (Mot. at 2.)[2]  The Government filed its Response to the Motion on September 3, 2020 (ECF No. 21), and the Court held a suppression hearing on September 29, 2021.  (*See* 9/29/21 Hearing Transcript ("Tr."), ECF No. 25.)  Also on September 29, 2021, the Court issued an Order directing the parties to submit proposed findings of fact and conclusions of law ("Proposed Findings") within ten days of the issuance of the hearing transcript.[3]  (ECF No. 24.)  The hearing transcript was issued October 6, 2021.  (ECF Nos. 25, 26.)  On October 15, 2021, the parties filed a Joint Motion requesting a ten-day extension of the deadline to file their Proposed Findings.  (ECF No. 27.)  The Court granted the Joint Motion for extension on October 18, 2021.

---

[1] Defendant was charged by Indictment, issued January 21, 2021, with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 1.)

[2] All record citations herein are to the CM/ECF pagination.

[3] At the hearing, Government counsel requested on the record that the parties be permitted to submit Proposed Findings once the hearing transcript was available.  (Tr. at 112.)

(ECF No. 28.)  On October 26, 2021, the parties filed their Proposed Findings.  (Def.'s Proposed Findings, ECF No. 29; Govt. Proposed Findings, ECF No. 30.)

After considering the Motion, the Government's Opposition (Opp., ECF No. 21), the evidence and testimony presenting at the hearing, and the parties' respective proposed findings, the Court denies the Motion to Suppress based on the findings of fact and conclusions of law set forth below.

I.      **FINDINGS OF FACT**

Based on the Court's assessment of the record, including the testimony, demeanor, and credibility of the witnesses at the suppression hearing, the Court makes the following factual findings.[4]

On September 6, 2019, at approximately 11:03 p.m., Philadelphia Police Department Highway Patrol Officers Kyle Smith ("Officer Smith") and Christopher Ficchi ("Officer Ficchi") (collectively, the "Officers") received a radio report that a black male had fired shots at a male complainant near 4700 Comly Street, in the 15th District of Philadelphia (the "Incident").  (Tr. at 6-8, 32; CAD Printout at 2, ECF No. 20-1.[5])  At approximately 11:09 p.m., the Officers arrived at the shooting location, where they surveyed the scene and located two shotgun shell casings.  (CAD Printout at 2; Tr. at 12, 36, 73-74.)

At the time of the Incident, Officer Smith had been a Philadelphia police officer for approximately 10 years and had been with the Highway Patrol almost three years.  (*Id.* at 6.)

---

[4] "It is well-settled that at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Harris*, 884 F. Supp. 2d 383, 387 (W.D. Pa. 2012) (internal citations and quotations omitted).

[5] The CAD Printout is a summary of radio calls prepared by police dispatch, often using codes and abbreviations.  (Tr. at 32, 76.)  It is not an exact transcription of radio calls.  (*Id.* at 76, 86.)

Officer Ficchi had 14 years on the police force and almost four years with Highway Patrol. (*Id.* at 71.) Officer Ficchi testified that Highway Patrol officers are assigned to different grids in different districts depending on recent violent crime in particular areas. (*Id.* at 72.) On the night of the Incident, he and Smith were assigned to the 15th District because at the time, "it was a high crime area, [and] we were told to go out and patrol that area due to the recent violent crimes in that area." (*Id.* at 72; *see also id.* (testifying that during the time period of the Incident, the Officers were assigned to the 15th District approximately once or twice per week to try to reduce violent crime in the area).) Officer Smith testified that in his experience, the 15th District was an area with "frequent drug sales" and "many shootings." (*Id.* at 10.)

Upon the Officers' arrival at the scene, Officer Ficchi and another police officer spoke with the complainant in the presence of Officer Smith, who observed and heard this conversation. (*Id.* at 11, 13-14, 35, 41, 48-49, 73.) The Officers described the complainant as agitated, jittery, emotional, and upset. (*Id.* at 13-14, 35, 75.) Officer Smith also testified that due to complainant's excited and jittery demeanor and a language barrier or accent, he had difficulty understanding some of what the complainant said. (*Id.* at 13-14.)

Officer Smith testified that the complainant described the person who fired the shots as: "[A] heavy male, a lot of clothes on. . . . I don't recall him giving a race or anything like that, but he just kept saying, heavy male, heavyset male, a lot of clothes" (*id.* at 14); "[as wearing] [h]eavy clothes, heavy clothes, heavyset guy" (*id.* at 35); and "heavyset guy with clothing on. Heavy clothing on" (*id.* at 41). Officer Ficchi similarly testified that the complainant described the suspect as: "[A] black male, heavyset with a jacket, with a dark colored jacket with a hood on." (*Id.* at 73.) The complainant also told the Officers that the shooter had left the scene eastbound on Comly Street from Torresdale Street. (CAD Printout at 2; Tr. at 32-33, 37.)

3

The Officers then left the scene to survey the area in their marked patrol car, with Officer Ficchi driving. (*Id.* at 17, 78.) They traveled east on Comly toward Vandike Street at a slow speed, approximately five to ten miles per hour. (Tr. at 14-15, 17, 37, 44-45, 75, 78-80.) The Officers testified that in their experience, individuals involved in shootings often remain in the general area of the crime scene. (*Id.* at 40, 77-78.) In addition, the complainant believed the shooting perpetrator was still in the area. (*Id.* at 75, 77.) Within a few minutes of beginning their survey, the Officers saw three males walking on the sidewalk from Vandike Street onto Comly Street heading east. (*Id.* at 16-19, 78-79, 81.) One of the men, later identified as Defendant, matched aspects of the description of the Incident suspect, as he was heavyset[6] and wearing heavy clothes, including a jacket over a hoodie. (*Id.* at 16-18, 41-42, 50-51, 78-79.) Prior to seeing these men, the Officers hadn't seen anyone else out on street, and no suspects had been apprehended for the Incident. (*Id.* at 15-16, 79-80.) The Officers acknowledged that they did not see any of the men with a visible firearm or bulge in their clothing indicative of a firearm and did not see the men engaging in drug transactions. (*Id.* at 45, 94.) Officer Smith noted, however, that "with heavy clothing, it's hard to make out whether there's a bulge. . . ." (*Id.*) Officer Ficchi also testified that he has encountered shooting suspects who have discarded their weapon, and has found a shotgun in a suspect's waistband and in the leg of a suspect's sweatpants. (*Id.* at 101.)

The Officers' car approached the three men from behind and, from their vantage, the Officers could not see the men's faces or discern their race. (*Id.* at 18-19, 40-41, 52, 79-80.) In addition, despite some streetlights, it was dark out and the lighting was limited. (*Id.* at 18, 79,

---

[6] The record reflects that Defendant weighed approximately 250 pounds at the time of the Incident. (Tr. at 54, 98.)

96.) The Officers pulled alongside the men and stopped the patrol car. (*Id.* at 19-20, 46, 80.) They were driving slowly and did not need to stop abruptly, did not activate the patrol car's lights or sirens, and did not block the men's path on sidewalk. (*Id.* at 20, 80-81.) As the Officers' car approached and stopped, and before the Officers got out of the car or were able to say anything to the men, at least two of them, including Defendant, immediately fled, running on foot.[7] (*Id.* at 20, 46, 80-82.) The Officers then got out of the car, with Officer Ficchi pursuing one of the men who fled, and Officer Smith chasing another man, later identified as Defendant. (*Id.* at 20, 82.) Officer Ficchi did not have his weapon drawn when he got out of car (*id.* at 97), and Officer Smith did not recall having his firearm out while chasing Defendant (*id.* at 58). Defendant fled east on Comly then turned south on Hegerman Street, where Officer Smith saw Defendant remove items from his pockets and throw a silver object that Officer Smith was "a thousand percent sure" was a firearm over his shoulder and into the yard of one of the homes on Hergerman Street. (*Id.* at 52; *see also id.* at 20-22, 55-58, 66-67, 69.) Shortly thereafter, Officer Smith caught up to Defendant, pushed him to the ground, and handcuffed him. (*Id.* at 22, 24, 58-59.) Officer Smith then recovered a firearm with a black handle and a black barrel covered by a silver slide from the yard of a house on Hegerman Street, where he had observed Defendant throw it. (*Id.* at 24, 64-65, 67-68.)

The three men were placed in the back of police cars and viewed by the complainant, who did not identify any of the men as the person who had shot at him. (*Id.* at 24-25, 83.) The Officers detained and processed Defendant for weapons violations, and the other two men were released. (*Id.* at 26, 83.) Once in custody, Defendant gave the Officers a false name—claiming

---

[7] Officer Smith testified that all three men fled (*see* Tr. at 20, 46), while Officer Ficchi testified that only two of them fled. (*see* Tr. at 81-82.) The Court finds this discrepancy immaterial as both Officers consistently testified that Defendant immediately fled when the Officers stopped their patrol car. (*Id.* at 20, 80.)

he was Marcus Rivera from New York—and a false date of birth.  (*Id.* at 26-29, 84-85.)  The Officers were unable to confirm Defendant's identity at the scene, and he was arrested under the name Marcus Rivera.  (*Id.* at 26-29.)  At the time of the arrest, Officer Ficchi documented that Defendant was wearing a green jacket, green hoodie, gray hoodie, gray sweatpants and blue sneakers.  (*Id.* at 100.)

## II. LEGAL STANDARDS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Evidence obtained through an unreasonable search or seizure is subject to exclusion at trial.  *See*, *e.g.*, Wong *Sun v. United States*, 371 U.S. 471, 484–85 (1963).  When a defendant seeks to suppress evidence allegedly obtained in an unlawful seizure, the threshold question for the court is whether the defendant was seized.  *United Sates v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009).  "Police officers are free to walk up to citizens in public and engage in discussion or ask them questions, as the law presumes this encounter to be consensual as long as the reasonable citizen would feel free to disregard the officers and go about their business."  *United States v. Lyons*, No. 18-171, 2020 WL 429112, at *4 (W.D. Pa. Jan. 28, 2020) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see also Smith*, 575 F.3d at 512 ("Whether an encounter with a police officer constitutes a search and/or seizure under the Fourth Amendment requires consideration of 'all the circumstances surrounding the encounter.'" (quoting *Bostick,* 501 U.S. at 439).)

"[A] seizure inquiry has two steps:  Was there in fact a seizure? If so, was that seizure reasonable?"  *Smith*, 575 F.3d at 313.  Distilling the Supreme Court's holding in *California v. Hodari D.*, 499 U.S. 621 (1991), the Third Circuit Court of Appeals explained:

> A seizure occurs when there is either (a) "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful," or

>(b) submission to "a show of authority." Put another way, when a seizure is effected by even "the slightest application of physical force," it is immaterial whether the suspect yields to that force. In contrast, if a suspect in the absence of physical force does not submit to an officer's show of authority, there is no seizure and no Fourth Amendment claim. "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."

*United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (quoting *Hodari D.*, 499 U.S. at 625-28 (internal citations omitted). Absent any application of physical force, a "show of authority" seizure may exist by virtue of "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Smith,* 575 F.3d at 313 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).) However, a show of authority "is insufficient to transform an encounter into a seizure without actual submission on the part of the person allegedly seized." *Id.*

If it is determined that a seizure occurred, the inquiry turns to its objective reasonableness under the totality of the circumstances. *See United States v. Hester*, 910 F.3d 78, 87 (3d Cir. 2018) (citing *Terry v. Ohio*, 392 U.S. 1 (1968).) "Brief, investigatory seizures" do not offend the Fourth Amendment "'when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Id.* at 84 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (alterations omitted). "Reasonable suspicion is 'a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (quoting *Wardlow*, 528 U.S. at 123). Regarding assessment of reasonable suspicion, "[t]he Supreme Court has stressed that the totality of the circumstances standard enables 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might

7

well elude an untrained person.'" *United States v. Thompson*, 772 F.3d 752, 759 (3d Cir. 2014) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002).) The factors relevant to assessing reasonable suspicion include "location, history of crime in the area, a suspect's nervous behavior and evasiveness and police officers' common sense judgments and inferences about behavior." *United States v. Connolly*, 349 F. App'x 754, 757 (3d Cir. 2009) (internal citations omitted); *see also United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009) ("The timing of the seizure is significant—if the seizure occurred after suspicious behavior such as flight, this factors into our analysis of whether there was reasonable suspicion to justify the seizure."); *United States v. Pigford*, 534 F. Supp. 3d 443, 449-50 (E.D. Pa. 2021) (quoting *Smith* and holding that defendant's flight before seizure supported officer's reasonable suspicion).

## II. CONCLUSIONS OF LAW

Applying the foregoing legal standards to the factual findings detailed above, the Court reaches the following conclusions of law.

First, the Officers did not seize Defendant when they stopped their patrol car near Defendant and his two companions. The defense has not alleged, nor is there any evidence that the Officers had any physical contact with Defendant or his companions or made any show of authority before Defendant fled. On the contrary, the uncontroverted record reflects that the Officers were driving slowly, came to a normal stop, had not activated the car's lights or sirens, did not have their weapons drawn, and did not get out of their vehicle or even speak to Defendant or the other men before Defendant fled. Moreover, even assuming, *arguendo*, that the Officers mere presence and decision to stop their car could be deemed a show of authority, Defendant did not submit, but immediately fled. Defendant's Motion asserts that Defendant "halted at the sight of the Officers" and thus "submitted to [their] show of authority." (Mot. at

4.) The record contains no evidence substantiating this assertion, and it was not repeated in Defendant's Proposed Findings submitted after the suppression hearing. (*See* Def.'s Proposed Findings.)

Second, under the totality of the circumstances, the Officers had reasonable, articulable suspicion to pursue and detain Defendant once he fled. The Officers encountered Defendant in the nearby vicinity of a shooting shortly after it was reported and only about fifteen minutes after the Officers arrived on the scene. The shooting and encounter with Defendant occurred in an area the Officers knew to be plagued by violent crime, including many shootings. The Officers observed that Defendant was heavyset and wearing heavy clothes, including a jacket and hood, all of which matched the complainant's description of the shooter. The reasonableness of the Officers' suspicion is not negated by the fact that they could not discern Defendant's race when they observed him from behind at night at a location illuminated only by streetlights. On the contrary, their suspicion was substantiated when Defendant immediately fled as soon as the Officers stopped their car. *See, e.g.*, *Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) ("[F]light combined with other factors may support a warrantless stop and frisk."); *United States v. Davis*, 328 F. App'x 138, 141 (3d Cir. 2009) (holding that defendant's unprovoked flight, along with other factors, provided reasonable suspicion for stop); *Pigford*, 534 F. Supp. 3d at 457 n.89 ("Headlong flight in a high-crime area provides reasonable suspicion." (quoting *United States v. Valentine*, 232 F.3d 350, 359 (3d Cir. 2000)).)

Third, Defendant's flight from the Officers is the antithesis of submission, and no seizure occurred until Officer Smith caught Defendant and used physical force to detain him. *See, e.g.*,

9

*Davis,* 328 F. App'x at 142 (holding that no seizure occurred until officer physically engaged defendant); *United States v. Figueroa*, No. 15-98, 2015 WL 7756008, at *3 (D.N.J. Nov. 30, 2015) ("A Fourth Amendment seizure does not occur until a fleeing defendant is in fact caught."), *aff'd*, 687 F. App'x 187 (3d Cir. 2017).

Finally, because Defendant threw away his gun before he was seized, he abandoned it, and it was therefore not a fruit of the seizure. *Davis*, 328 F. App'x at 142 (citing *Hodari*, 499 U.S. at 629; *Abel v. United States*, 362 U.S. 217, 241 (1960).)

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is denied. A corresponding Order will issue concurrently herewith.

                            **BY THE COURT:**

                            /s/ John Milton Younge
                          **JUDGE JOHN MILTON YOUNGE**